## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHESTER LOWE HUFF, | § | |
| Plaintiff, | § | |
| v. | § | CASE NO. 2:11-cv-148 |
| | § | |
| KIMBERLY PUNDT, ET AL. | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION ON
## <u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

In this civil rights action, Texas state prisoner Chester Lowe Huff ("plaintiff") complains that defendants Kimberly Pundt and Frances Ellison-Cook exposed him to unsanitary conditions of confinement in violation of his Eighth Amendment right to be free from cruel and unusual punishment, and he moves for summary judgment arguing that there is no genuine issue of a material fact that defendants knew of the unconstitutional conditions of confinement, yet failed to remedy the problems. (D.E. 32, 39). Defendants oppose plaintiff's summary judgment motion, and have filed a cross-motion for summary judgment. (D.E. 40). Plaintiff has filed a response opposing defendants' summary judgment motion. (D.E. 43).

For the reasons stated herein, it is respectfully recommended that the Court deny the summary judgment motions of both parties, and that this case proceed to trial on the merits.

## I.    Jurisdiction.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

II.     **Procedural background.**

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and is currently incarcerated at the McConnell Unit in Beeville, Texas.  He filed his original complaint on May 4, 2011, alleging that a certain shower in administrative segregation ("ad. seg.") posed an unreasonable risk to his health and safety, and that certain McConnell Unit officers and officials were aware of the hazardous shower, yet they forced him to use the shower and refused to fix it, in deliberate indifference to his health and safety.

A <u>Spears</u>[1] hearing was conducted on June 9, 2011, following which plaintiff's Eighth Amendment claims were retained against two officers that worked in ad. seg., Kimberly Pundt and Frances Ellison-Cook.  (D.E. 12).  Plaintiff's claims against the other officials were dismissed.  <u>Id.</u>

On August 31, 2011, defendants filed their answer to plaintiff's complaint and raised the defense of qualified immunity.  (D.E. 24).

On February 9, 2012, and April 2, 2012, plaintiff filed motions for summary judgment with exhibits (D.E. 32, 38, 39).

On April 4, 2012, defendants filed their response in opposition to plaintiff's summary judgment motion, and a cross motion for summary judgment.  (D.E. 40).

---

[1]<u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985).

On April 27, 2012, plaintiff filed his response to defendants' summary judgment motion.  (D.E. 43).

## III.   Summary judgment evidence.

In support of his  motion for summary judgment, plaintiff offers the following:

Ex. J:          Copies of inspection logs;

Ex. K:          Work order dated February 8, 2011;

Ex. X:          Portions of plaintiff's medical records; and

Ex. Y:          Copies of I-60 grievances.[2]

Defendants offer the following:

Ex.  A          Relevant portions of plaintiff's TDCJ-CID grievance records, with business records affidavit;

Ex. B:          Defendant Pundt's interrogatory responses;

Ex. C:          Defendant Ellison-Cook's interrogatory responses; and

Ex. D:          Plaintiff's TDCJ Health Services Archives records.

The summary judgment evidence establishes the following:

Defendant Ellison-Cook has been assigned to the McConnell Unit since 2001. (DX-C, Ellison-Cook Interrogatory Response ("IR") No. 1).  From 2001 through September 2010, she worked as a correctional officer.   Id.   During that time period, she worked in both

---

[2] Plaintiff's exhibits (PX) are filed at D.E. 38, and are identified as Exhibits J, K, X and Y by plaintiff.  Defendants' exhibits (DX) are filed at D.E. 40.  Plaintiff offers additional exhibits in his summary judgment response. (D.E. 43).

General Population and Ad. Seg.  Id.  As a correctional officer, her primary responsibilities were for the care, custody, and control of the offenders assigned to the McConnell Unit.  Id.

From 2007 through 2010, in addition to her responsibilities as a correctional officer, Officer Ellison-Cook served as the Alternate Risk Manager and Administrative directive ("A.D.") 10.20 Officer.  (DX-C, Ellison-Cook IR No. 1).   As the Alternate Risk Manager and A.D. 10.20 Officer, Officer Ellison-Cook was responsible for compiling the A.D. 84 forms, which are also known as the inspection logs, and verifying the information and the maintenance requests recorded.[3]

.        On September 25, 2010, Officer Ellison-Cook became a "safety officer." (DX-C, Ellison-Cook IR No. 1).   As a safety officer, Officer Ellison-Cook is responsible for conducting comprehensive inspections of the McConnell Unit facilities to verify that the Unit is in compliance with established safety codes.  Id.

Defendant Kimberly Pundt[4] worked at the McConnell Unit from 2001 through 2006 as a Counsel Substitute III providing assistance to inmates in disciplinary hearings.  (DX-B, Pundt IR No. 1).  From 2006 through 2008, Ms. Pundt worked as a grievance supervisor and

---

[3] For example, if an offender reported a clogged sink, a correctional officer would note it on an A.D. 84 form.  (DX-C, Ellison-Cook IR No. 1).  Officers could also report maintenance issues that they personally observed on A.D. 84 forms. Id.  Once Officer Ellison-Cook received the A.D. forms, she would verify whether the noted issue needed attention or repair.  Id.  If maintenance was necessary, Officer Ellsion-Cook would inform the Maintenance Supervisor. Id.  The Maintenance Supervisor was the individual responsible for prioritizing maintenance requests and creating work orders.  Id.

[4] Kimberly Pundt's legal name is now Kimberly Almendarez; she was promoted to sergeant in April 2011.  (DX-B, Pundt IR No. 1).

was responsible for investigating Step 1 grievances filed at the McConnell Unit.  Id.  In the

later part of 2008, Ms. Pundt became a correctional officer III.  Id.  From 2010 through April

2011, in addition to working as a correctional officer, Officer Pundt was the A.D. 10.20

Officer.  Id.  However, she worked in ad. seg. for only one month, from November 1, 2010

through December 1, 2010.  Id.

On April 20, 2010, plaintiff was assigned to ad. seg. (D.E. 12 at 3).

In November 2010, plaintiff complained to officials that the ad. seg. shower located

in B-section, 1-row (the "1-row shower") was unsafe and posed a dangerous risk to his health

and safety because the light was broken out and live electrical wires were exposed.  (D.E. 12

at 3).

On November 17, 2010, the shower was inspected by Officer R. Hinojosa who noted

in the inspection log[5] that the shower light was out.  (PX-J at 1).  The inspection log for

December 7, 2010, indicates that a piece of metal was missing from the 1-row shower.  (PX-J

at 2).  The inspection log dated December 13, 2010 reflects that the shower light was not

working.  (PX-J at 3).  The inspection log for December 26, 2010 indicates that the 1-row

shower light remained out, and that 2-row shower did not work.  Id. at 4.

On January 1, 2011, Officer Guerra noted that the shower light was out in the 1-row

shower, and he noted "safety hazard present."  (PX-J at 5).

---

[5] The inspection log forms are also identified as forms "A.D. 84."  (DX-B, Pundt IR No.
3).  The A.D. 84 form or inspection log is where officers can record offender complaints about
maintenance or structural issues or note their own personal observations about needed repairs.
Id.

On January 28, 2011, it was noted that there was no light in the 1-row shower.  (PX-J at 6).  On January 31, 2011, Officer Williams and Officer Raab noted in the inspection log that the light was out in 1-row shower, and that "bare wires" were present.  Id. at 7.

On January 31, 2011 at approximately 12:30 p.m., Officer Raab attempted to escort plaintiff to the 1-row shower.  (DX-A at 16).  Officer Raab told plaintiff that he knew about the problems with the shower, but that other inmates were using it, and that Officer Pundt had authorized the shower to be used, with the caveat that inmates "not touch" anything in the shower.  Id.  Plaintiff objected and said it was not possible to use the shower without touching the buttons because the water turned off every 10 seconds. Id.  He also complained that the light was not working, and was about to fall down because it was rusted.  Id. Plaintiff stated that he had told Lieutenant Stroleny about the problems with the shower on December 17, 2010, but that nothing had been done  Id.  In addition, he had complained to Captain Rodriguez on January 24, 2011, and to Lieutenant Luis Pulido on January 30, 2011. Id.  Plaintiff refused to go to the shower, and Officer Raab called for rank.  Id.  Sergeant Ramirez arrived and then inspected the shower with a flashlight.  Id.  Sergeant Ramirez ordered the shower closed off immediately, and he called officer Pundt to advise her about the problems with  the shower.  Id.  Officer Raab told plaintiff that he would get a disciplinary case for refusing to shower.  Id. at 17.

On February 1, 2011, plaintiff filed a Step 1 grievance, Grievance No. 2011091999, stating that he had been complaining about the ad. seg. shower since December 2010, but that nothing had been done, and tha Officer Raab had ordered him to use it.  (DX-A at 16-17).

6

That same day, a grievance investigation worksheet was initiated concerning plaintiff's complaints about the shower.  (DX-A at 21-24).

On February 3, 2011, Officer Vasquez noted in the inspection log that the 1-row shower had no light, and that there was a "hole in door on top."  (PX-J at 8).   On February 4, 2011, it was noted in the inspection log that "wires are sticking out and the light fixture doesn't work."  (PX-J at 9,17).  On February 8, 2011, the shower light was still not working.  (PX-J at 10).

On February 8, 2011, work order 404811007561 was opened to fix the light.  (DX-A at 21).  Captain Rodriguez reported that maintenance had been notified.  Id. at 23.

On February 9, 2011, at approximately 11:00 a.m., Officer Herrera reported to plaintiff's cell to escort him to his shower.  (DX-A at 12-13).  Plaintiff was handcuffed and escorted to the B-section, 1-row shower.  Id. at 12.  Plaintiff refused to use that shower and complained that it was a hazard.  Id.  He was later denied a meal.  Id.

On February 15, 2011, the work order for the shower was closed and it was noted that two lamps were replaced.  (DX-A at 21).

On February 21, 2011, plaintiff filed a Step 1 grievance, Grievance No. 2011104439, complaining about the hazardous shower and about being denied a meal for refusing to use it.  (DX-A at 12-13).

The Inspection Log dated March 13, 2011, notes that the ad. seg. A and B-section showers were inoperable.  (PX- J at 13).

7

On March 17, 2011, plaintiff filed a Step 1 grievance, Grievance No. 2011120238, stating that he had been complaining about the ad. seg. shower since December 2010, but that nothing had been done. (DX-A at 1-2). He noted that the shower was filthy and smelled like a sewer, and had not been cleaned since January 12, 2011. Id. at 1.

On March 18, 2011, a Grievance Investigation Worksheet was initiated on plaintiff's complaint about the cleanliness of the shower. (DX-A at 6-8). On March 21, 2011, Major Castro reported that the showers had been cleaned and that maintenance had been alerted regarding the shower being inoperable. Id. at 8.

The Inspection Log dated March 31, 2011 notes that for the ad.seg. shower on 1-row, "water keeps running." (PX-J at 18).

On April 6, 2011, Warden Jackson denied plaintiff's Grievance No. 2011120238, stated that the showers had been cleaned and that maintenance had been contacted "regarding any inoperable shower." (DX-A at 2). [6]

On April 22, 2011, a Grievance Investigation Worksheet was opened regarding plaintiff's complaint that the ad. seg. shower had been out of order since December 2010, and it had not been cleaned since March 2011 making it unsanitary and hazardous. (DX-A at 5, 9-11). Plaintiff related that he had complained about the issue repeatedly, and he wished to speak to Attorney Affairs about the problem. Id. at 5.

---

[6] Plaintiff filed a Step 2 appeal of Grievance No. 2011120238, and it was denied. (DX-A at 3-4).

On April 25, 2011, Grievance Investigator K. Tollette sent an inquiry about plaintiff's complaints to Officer Ellison-Cook.  Id. at 11.  Officer Ellison-Cook responded that the showers were being power-washed  and also that they had been "constantly cleaned.'  Id. On April 26, 2011, Grievance Investigator K. Tollette reported that an appropriate response to plaintiff's Step 2 appeal  would be as follows:

> Your complaint has been noted and appropriately addressed a step one.  Work order 404811010614 was generated to repair the shower; there is no record that the shower was inoperative in December.  Risk Manager, Ms. Cook contends that the showers are being power washed.  You have failed to present witnesses or evidence supporting your allegations regarding hazardous and unsanitary living conditions.  No further action warranted.

(DX-A at 5).

On April 9, 2011, plaintiff reported to the McConnell Unit infirmary complaining of a bump under his left eye for the past 6 days.  (DX-D at 1-10).  Upon examination, plaintiff was found to have a "pustule on lower lid" of his left eye.  Id. at 1.  Plaintiff was instructed to apply moist heat to the infected area for comfort, and was told that a provider would be contacted for further evaluation.  Id. at 9.

On April 27, 2011, plaintiff was seen in the infirmary by Nurse Campos for continued swelling to his left eye.  (DX-D 11-19).  He was prescribed Chlor-Trimeton for allergies for seven days.  Id. at 17.

On May 4, 2011, plaintiff submitted a sick call request ("SCR") complaining about the bump under his left eye and stating that "it hurts a lot."  (DX-D at 20).  Plaintiff noted

that he was supposed to have been seen by a doctor, but had not been, and he requested that he be seen by Ms. Silverleaf.  Id.

On May 9, 2011, plaintiff was seen in the infirmary by Nurse Salinas for his complaint of a swollen left eye and cheek, plus pain.  (DX-D at 21-29).  Plaintiff denied any injury and related that he just woke up with his eye swollen over a month ago.  Id. at 29.  Upon examination, Nurse Salinas noted a hard nodule under the left outer area of the eyelid with swelling, but no drainage.  Id. at 29.  Plaintiff was advised that he would be scheduled to see a provider for evaluation of his left eye.  Id.

On May 16, 2011, plaintiff was seen by Dr. Whitt for the swelling to his left eye and cheek.  (DX-D at 30-31).  Dr. Whitt prescribed plaintiff an antibiotic, Amoxicillin, as well as an antibiotic ointment for the eye, Gentak. Id. at 30.

On May 21, 2011, plaintiff was seen cell-side by Nurse White for follow-up care concerning his eye.  (DX-D at 32).  Nurse White noted that plaintiff's left eye was still swollen, but there was no sign of drainage, nor was it bloodshot.  Id.  Nurse White advised plaintiff on how to use the eye ointment and advised him to file a SCR for further evaluation. Id.

On May 23, 2011, plaintiff was seen by Dr. Whitt in the infirmary with continuing complaints about his left eye.  (DX-D at 33-34).  Dr. Whitt diagnosed plaintiff with a stye, and she continued him on heat pack treatments and antibiotics, and also prescribed Maxitrol eye drops.  Id. at 33.  Dr. Whitt noted that she would consider an opthamology referral if plaintiff did not improve.  Id.

On June 3, 2011, plaintiff was seen by the nursing staff for a follow-up visit.  (DX-D at 35-41).  Plaintiff stated that the stye had not improved and he requested a referral to a specialist.  Id. at 36.  Plaintiff was prescribed Chlorpheniramine, an allergy medication.  Id. at 40.

**IV.    Summary judgment standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses.  See id.  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein."  Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559 (5th Cir. 1992).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248-49. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed." Anderson, 477 U.S. at 250-51.

## V.   Discussion.

Plaintiff contends that Officer Pundt and Officer Ellison-Cook were deliberately indifferent to his health and safety because, as A.D. 10.20 Officers, they both knew as early as November 2010 of the hazardous and unsanitary conditions of 1-row shower, yet they ignored the risks and failed to ensure that the shower was fixed, and continued to force inmates to use the unsafe shower. He suggests that, as a result of being forced to use the shower, he was afraid of being electrocuted and received disciplinary cases for refusing to take showers. In addition, he believes that the unsanitary conditions of the shower may have cause him to contract the eye infection.

Defendants maintain that they are not liable for damages because, (1) the complained of conditions did not rise to the level of a constitutional violation, and (2) even if the

12

conditions were unconstitutional, their actions were objectively reasonable because they reported the shower conditions to the maintenance officer and thereafter, they had no authority or involvement as to prioritizing the maintenance work orders such that they are entitled to qualified immunity.

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 230 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).  To discharge this burden, the plaintiff must satisfy a two-prong test." Atteberry v .Nocana Gen. Hosp., 430 F.3d 245, 251-52 (5th Cir. 2005).  First he must claim that the defendants committed a constitutional violation under current law.  Id. (citation omitted).  Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.  Id.

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson, 555 U.S. at 236 (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

13

**Step 1 – Constitutional violation.**

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. Prison officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates. Farmer v. Brennan, 511 U.S. 825, 832 (1994). Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 8-10 (1992); Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement. First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. Hudson, 503 U.S. at 8. The challenged condition must be "extreme." Id. at 9. While an inmate "need not await a tragic event" before seeking relief," Helling v. McKinney, 509 U.S. 25, 33 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. Id. at 35. Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury will actually be caused by exposure to [the challenged condition of confinement]. Id. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk. Id. In other words, the prisoner must show that the risk of which he

14

complains is not one that today's society chooses to tolerate.  Id. at 36.  The Eighth Amendment thus guarantees that prisoners will not be "depriv[ed] ... of the minimal civilized measure of life's necessities."  Rhodes, 452 U.S. at 347.

Second, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue.  Hudson, 503 U.S. at 8.  The proper standard is that of deliberate indifference.  Wilson v. Seiter, 501 U.S. 294, 303 (1991).  Negligence does not suffice to satisfy this standard, id. at 305, but a prisoner need not show that the prison official acted  with "the very purpose of causing harm or with knowledge that harm would result."  Farmer, 511 U.S. at 835.  In defining the deliberate indifference standard, the Farmer Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837.  Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

Defendants argue that plaintiff was only ordered to use the 1-row shower on two occasions, such that the complained-of condition was not of sufficient duration to rise to a constitutional violation.  However, although plaintiff might have only filed two specific grievances when ordered to use the 1-row shower, he testified that, rather than chance using the 1-row shower, he bathed in his "sink and toilet."  (D.E. 43 at 3).  Indeed, plaintiff's summary judgment evidence establishes that, beginning in November 2010, complaints were

15

noted in the inspection logs about 1-row shower. The 1-row shower was identified repeatedly as having problems, ranging from: the lights not working, exposed wires, rusted fixtures, holes in the ceiling and sheet-rock, filthy with black mold, to completely inoperable, on the following dates: November 6 and 17, 2010; December 7, 13, and 26, 2010; January 1, 28, and 31, 2011; February 3, 4, 8, 9, and 25, 2011; March 31, 2011. (See PX-J at 1-14). Clearly, the shower posed a constant maintenance problem to staff. It appears that, even if repairs were made on one day, the repairs did not last as the 1-row shower would again be listed on the inspection log as needing attention. Thus, plaintiff's testimony that the shower posed a continued source of anxiety to him concerning its safety is grounded in some fact and supported by objective evidence. The fact that the 1-row shower was repeatedly listed in the inspection logs indicates that either the necessary repairs were never made or the problems complained of were reoccurring, thus indicating that more extensive repairs were warranted.

Plaintiff testified that he was afraid of being electrocuted in the shower. He complained of exposed wires and rusted light fixtures. The inspection logs confirm the existence of problems that would substantiate plaintiff's fears, and Farmer authorizes a prisoner to seek relief "to prevent a substantial risk of serious injury from ripening into actual harm." Farmer, 511 U.S. at 845 (1994) (a prisoner does not have to "await the consummation of threatened injury to obtain preventive relief" (citation omitted)).

In this case, the uncontested summary judgment evidence establishes that the 1-row shower presented a condition that was sufficiently serious and persistent as to constitute an unconstitutional condition of confinement, and plaintiff's exposure to that condition amounts to the infliction of punishment in violation of the Eighth Amendment. The fact that plaintiff

was not electrocuted or that he may or may not contracted the eye infection from the shower

conditions complained of is not fatal to his claim.

### 2.     Objective reasonableness.

If the Court finds a constitutional violation based on the summary judgment evidence

submitted, it must then determine whether the violated constitutional right was clearly

established within the context of the particular case.  Saucier, 533 U.S. at 201.

In this case, defendants do not dispute that the rights they allegedly violated were

clearly established.  Indeed, the Fifth Circuit has recognized that an unsanitary environment

can support an Eighth Amendment claim of deliberate indifference, noting:

> As a safeguard against the "gratuitous infliction of
> suffering," the eighth amendment forbids confinement under
> conditions that can lead to painful and tortuous disease with no
> penological purpose.  We concluded over a decade ago that the
> eighth amendment forbids deprivation of the basic elements of
> hygiene.  We observed this "common thread" woven through
> judicial condemnations of prison conditions, noting in most of
> the prior cases the deprivation of facilities for elementary
> sanitation.

Daigre v. Maggio, 719 F.2d 1310, 1312 (5th Cir. 1983).  See also Sanford v. Brookshire, 879

F. Supp. 691, 693 (W.D. Tex. 1994) ("Prison authorities may not withhold from prisoners

the basis necessities of life, which includes reasonably adequate sanitation").

Defendants argue that they were not personally involved in the constitutional violation

because they did not order plaintiff to shower in the 1-row shower, and, in addition, as the

A.D. 10.20 officers or safety officers, they were not responsible for prioritizing maintenance

repairs; instead, they simply verified the complaints and turned this information over to the

17

Building Maintenance official, Sandy Garza.  However, defendants' arguments appear to defeat the very purpose of having a safety or A.D. 10.20 officer.  Defendants both testified that the use of the A.D. 84 forms/inspection logs was to allow the unit officers to make note of any maintenance or structural problems they observed, as well as any problems reported by offenders.  (DX-B, Pundt IR No. 1; DX-C, Ellison-Cook IR No 1).  The A.D. officer would then verify "whether the noted issue needed attention or repair."  (DX-B, Pundt IR No. 1; DX-C, Ellison-Cook IR No. 1).  Stated another way, however, if an A.D. officer did not verify a problem, it would not get reported as needing attention to the Building Maintenance Supervisor.

In this case, neither defendant testified that she actually verified that the 1-row shower needed repair and then sent that information to Sandy Garza, the Building Maintenance official.  Moreover, defendants have not offered the affidavit of Sandy Garza stating that she received verified reports about the 1-row shower, but that she, independently, decided other maintenance issues were more pressing.  There is no evidence that either defendant performed their job properly because if either had, the shower would not have been included on the inspection logs from November 2010 through March 2011.

Officer Pundt argues that she cannot be liable to plaintiff because she was the A.D. 10.20 Officer for only one month in November 2010, before being transferred from 12-Building on December 1, 2010.  However, the problems with the shower were first noted in the inspection log on November 17, 2010.  (PX-J at 1).  Officer Pundt has failed to explain what she did with this information.  Did she verify the problem and refer it to Ms. Garza?

18

Did she look at the shower herself and determine the complaints were groundless?  The fact that the shower was still noted in the inspection logs in December 2010 reveals only that the problem was not fixed.  There is no evidence as to whether or not Officer Pundt's actions were objectively reasonable.

Officer Ellison-Cook had more opportunities to see that the 1-row shower was referred for repair as she worked as both A.D. 10.20 officer and the safety officer in 2011.  However, there is no affirmative testimony as to her actions concerning the 1-row shower and only the objective inspection logs indicating that the shower remained a hazard.

It cannot be said that the actions of either defendant were objectively reasonable in this case given their positions as A.D. 10.20 officer and/or safety officers, and the documented complaints about 1-row shower.  At some point, an official had to take responsibility.  Defendants contention that they are absolved from liability because they did not order plaintiff to bathe in the 1-row shower is disingenuous because the correctional officers that ***do*** order the prisoners into the showers necessarily rely on other officials, such as the A.O. 10.20 officers, to ensure that the premises are safe.

Plaintiff's evidence establishes that there is a genuine fact issue as to whether defendants acted reasonably in the context of this case.  Therefore, summary judgment is not appropriate.

**Damages.**

Defendants argue that, even if they violated plaintiff's constitutional rights, he is not entitled to damages against them because he has not suffered a physical injury as a result of

19

the alleged constitutional violation.  See 42 U.S.C. § 1997e(e) ("[n]o federal civil action may

be brought by a prisoner confined in a jail, prison or other correctional facility, for mental

or emotional injuries suffered while in custody without a prior showing of physical injury.").

Defendants point out that plaintiff did not seek medical attention for his eye infection until

April 9, 2011, after he had been moved from ad. seg., and that he did not tell the medical

staff that he believed his eye infection was attributable to the 1-row shower conditions.  (D.E.

40 at 13).  Defendants also maintain that plaintiff's sty on his left eye is a *de minimis* injury

such that it cannot support a claim for § 1983 damages.  Id.

The inspection logs indicate that there were problems with the 1-row shower as late

as March 31, 2011.  (See PX-J at 18 "water keeps running").  It was not until March 21, 2011

that Major Castro reported that the showers were clean, although no definitive answer could

be provided as to whether the shower was operable or not.  (DX-A at 6).  Plaintiff could have

developed an eye infection in late March 2011 and then not been seen in the infirmary until

April 2011.  Plaintiff was not required to inform medical personnel his personal opinion as

to how he might have contracted an eye infection.  In addition, plaintiff testified that, due to

the unavailability of 1-row shower, he was forced to bathe in his sink and toilet, and this

practice could have lead to his eye infection.

Defendants have failed to offer any summary judgment evidence that refutes

plaintiff's allegations that the 1-row shower conditions ultimately caused his eye infection,

such that a fact issue remains on the issue of whether or not plaintiff sustained a physical

injury.  Defendants' contention that the injury is *de minimis*  is invalid because the condition

lasted for over one month, caused plaintiff pain, antibiotics were necessary, and referral to a specialist was considered.  (See DX-D at 1-40).

## V.      Recommendation.

For the reasons stated herein, it is respectfully recommended that the Court deny plaintiff's motions for summary judgment (D.E. 32, 39), as well as deny defendants' summary judgment motion (D.E. 40), and that this case proceed to trial on the merits.

Respectfully submitted this 29th day of June, 2012.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).